In the
United States Court of Appeals
For the Seventh Circuit

No. 99-2656

Mark A. Smith,

Plaintiff-Appellant,

v.

Ford Motor Company,

Defendant-Appellee.


Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. IP97-1965-C-Y--Richard L. Young, Judge.


Argued February 10, 2000--Decided June 2, 2000


Before Coffey, Flaum, and Diane P. Wood, Circuit
Judges.

Flaum, Circuit Judge.  Mark A. Smith filed suit
in Indiana state court against Ford Motor Company
("Ford") alleging that the injuries he sustained
from a car accident were the result of a
defective product designed and manufactured by
Ford. Ford removed the suit to the United States
District Court for the Southern District of
Indiana under 28 U.S.C. sec.sec. 1332 and
1441(a), and the district court dismissed Smith's
suit with prejudice. For the reasons stated
herein, we reverse and remand.

I.  BACKGROUND

     On November 8, 1995, at approximately 2:00
a.m., Smith was involved in a one-car accident
when he fell asleep at the wheel of his Ford
Econoline 150E van and careened off the road. At
the time of the accident, Smith was traveling in
the rightmost westbound lane of Highway 50 near
Dillsboro, Indiana. After falling asleep, Smith
crossed over the left lane, across a grassy
median, and over the two eastbound lanes before
he awoke. Upon waking, Smith jerked the wheel of
the van to the right to move the van back to the
westbound lanes of traffic. Smith claims that at
this point, the steering mechanism in the van
malfunctioned and he was no longer able to
control the van. The van left the road, hit a

concrete culvert, and eventually came to rest in a soybean field. Smith suffered several injuries as a result of this accident. After the accident, Smith stored the van and alleges that it has remained in an unaltered condition.

On November 7, 1997, Smith filed a complaint against Ford in Indiana state court alleging that his injuries from the 1995 accident were caused by a defect in the power steering gearbox of the Ford van he was driving. Ford removed the case to the United States District Court for the Southern District of Indiana, invoking that court's diversity jurisdiction.

Smith proposed to call two experts in support of his case. His first expert was James Cassassa, a mechanical engineer, who formerly worked for General Motors performing accident reconstruction and analysis, and who currently works for Wolf Technical Services, Inc., a private company, performing similar work. Cassassa inspected the Ford van in May 1996 and May 1998. As a result of his inspections, Cassassa concluded that there was an internal failure in the steering gearbox of the van, that the failure had occurred while the van was in use before it left the road, and that the failure was not caused by the impact of the van with anything else. Although Cassassa was able to conclude that the steering had failed due to a defect in the parts inside of the steering gearbox, he was unable to determine whether the defect was due to the design or the manufacture of the affected parts. Cassassa outlined several hypothetical design and manufacturing defects that could have caused the failure.

Smith's second witness was Karl Muszar, a metallurgical engineer, who worked for General Motors for seventeen years before leaving to form his own engineering firm. After the gearbox was removed from Smith's van and opened under the supervision of a Ford technician, Muszar inspected and tested the mechanisms inside the gearbox. He determined that the steering had failed due to overloading of the torsion bar and that the specific parts were manufactured according to Ford specifications. Like Cassassa, Muszar concluded that the steering failure was the result of either a manufacturing defect or a design defect but could not determine which type of defect had actually occurred. Muszar offered several hypothetical explanations for the failure and stated that in his opinion using a different metal for the torsion bar would have been a better choice.

Smith's original counsel withdrew on February 4, 1999, and Smith's present counsel first appeared before the district court on February 18, 1999.

On March 24, 1999, Smith's new counsel filed a motion to continue the jury trial, which had been set for April 26, 1999, because he had a previous trial already set for state court on the same day. The district court denied this motion on April 15, 1999, and the trial schedules were not worked out until April 20, when the state court judge was persuaded to reset the state trial. Meanwhile, on March 15, Ford filed a motion to exclude the testimony of Smith's experts. Smith was ordered to respond to this motion by April 19, but did not respond until April 21, when he filed a motion for leave to file late along with his response to Ford's motion to exclude his expert witnesses. The district court struck Smith's written response but allowed Smith to respond to the motion in open court on April 26.

On April 26, after empaneling the jury, the district court conducted a hearing regarding Ford's motion to exclude Smith's experts. The district court concluded that the experts were not qualified to testify as to design defects and that their testimony would not be helpful to the jury. The district court then granted Ford's motion to exclude both experts. Smith moved for a continuance to acquire a design expert who would satisfy the court, but this motion was denied. Ford then moved to dismiss the case on the ground that under Indiana tort law a claim for product liability could not be proven without experts. The district court granted this motion and dismissed the case with prejudice. Smith now appeals.

II. DISCUSSION

Smith argues that the district court erred when it 1) excluded his expert witnesses; 2) denied his motion for a continuance to obtain additional experts; and 3) granted Ford's motion to dismiss his claims with prejudice. We address each of these arguments in turn.

A. Exclusion of Expert Witnesses

Smith first argues that the district court erred in excluding the testimony of his experts Cassassa and Muszar on the ground that neither witness was qualified as an expert in a relevant field and neither witness's testimony was reliable or would have been helpful to the jury. We review de novo whether the district court applied the appropriate legal standard in making its decision to admit or exclude expert testimony. See Walker v. Soo Line R.R. Co., 208 F.3d 581, 590 (7th Cir. 2000); United States v. Hall, 165 F.3d 1095, 1101 (7th Cir. 1999). We review for abuse of discretion the district court's choice of factors to include within that

framework as well as its ultimate conclusions regarding the admissibility of expert testimony. See Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 152 (1999) (stating that the abuse of discretion standard "applies as much to the trial court's decisions about how to determine reliability as to its ultimate conclusion"). A court abuses its discretion when it commits "a serious error of judgment, such as reliance on a forbidden factor or failure to consider an essential factor." Powell v. AT&T Comm., Inc., 938 F.2d 823, 825 (7th Cir. 1991).

The admission of expert testimony is specifically governed by Federal Rule of Evidence 702 and the principles announced in Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993). Rule 702 states:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

The Supreme Court in Daubert interpreted this rule to require that "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." 509 U.S. at 589. In other words, as a threshold matter "a district court is required to determine (1) whether the expert would testify to valid scientific knowledge, and (2) whether that testimony would assist the trier of fact with a fact at issue." Walker, 208 F.3d at 586. When making these determinations, the district court functions as a "gatekeeper" whose role is "to keep experts within their proper scope, lest apparently scientific testimony carry more weight with the jury than it deserves." DePaepe v. General Motors Corp., 141 F.3d 715, 720 (7th Cir. 1998).

In analyzing the reliability of proposed expert testimony, the role of the court is to determine whether the expert is qualified in the relevant field and to examine the methodology the expert has used in reaching his conclusions. See Kumho, 526 U.S. at 153. An expert may be qualified by "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. While "extensive academic and practical expertise" in an area is certainly sufficient to qualify a potential witness as an expert, Bryant v. City of Chicago, 200 F.3d 1092, 1098 (7th Cir. 2000), "Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience," Walker, 208 F.3d at 591. See Kumho,

526 U.S. at 156 ("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience."). Thus, a court should consider a proposed expert's full range of practical experience as well as academic or technical training when determining whether that expert is qualified to render an opinion in a given area.

A court's reliability analysis does not end with its conclusion that an expert is qualified to testify about a given matter. Even "[a] supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method." Clark v. Takata Corp., 192 F.3d 750, 759 n.5 (7th Cir. 1999). However, we emphasize that the court's gatekeeping function focuses on an examination of the expert's methodology. The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact, or, where appropriate, on summary judgment. See Daubert, 509 U.S. at 595 ("The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate."); Walker, 208 F.3d at 587 (stating that when addressing whether expert testimony is reliable the district court should not consider the "factual underpinnings" of the testimony but should determine whether "[i]t was appropriate for [the expert] to rely on the test that he administered and upon the sources of information which he employed").

When analyzing the relevance of proposed testimony, the district court must consider whether the testimony will assist the trier of fact with its analysis of any of the issues involved in the case. The expert need not have an opinion on the ultimate question to be resolved by the trier of fact in order to satisfy this requirement. See Walker, 208 F.3d at 587. In addition, "[e]xperts are allowed to posit alternate models to explain their conclusion." Id. at 589. Where an expert's hypothetical explanation of the possible or probable causes of an event would aid the jury in its deliberations, that testimony satisfies Daubert's relevancy requirement. Id. at 589-90. However, we caution that these hypothetical alternatives must themselves have "analytically sound bases" so that they are more than mere "speculation" by the expert. See DePaepe, 141 F.3d at 720. The question of whether the expert is credible or whether his or her theories are correct given the circumstances of a particular case is a factual one that is left for the jury to determine after opposing counsel has been provided the

opportunity to cross-examine the expert regarding his conclusions and the facts on which they are based. Walker, 208 F.3d at 589-90. It is not the trial court's role to decide whether an expert's opinion is correct. The trial court is limited to determining whether expert testimony is pertinent to an issue in the case and whether the methodology underlying that testimony is sound. See Kumho, 526 U.S. at 159 (Scalia, J., concurring) (stating that the trial court's function under Daubert is to exercise its discretion "to choose among reasonable means of excluding expertise that is fausse and science that is junky").

The Daubert standard applies to all expert testimony, whether it relates to areas of traditional scientific competence or whether it is founded on engineering principles or other technical or specialized expertise. See Kumho, 526 U.S. at 141. In Daubert, the Supreme Court outlined four factors that may be pertinent to the district court's analysis of expert testimony. Those traditional factors are: 1) "whether [the expert's theory] can be (and has been) tested"; 2) "whether the theory or technique has been subjected to peer review and publication"; 3) "the known or potential rate of error"; and 4) "general acceptance" among the relevant scientific community. Daubert, 509 U.S. at 593-94. However, as the Supreme Court has repeatedly emphasized, the Rule 702 test is a flexible one, and no single factor is either required in the analysis or dispositive as to its outcome. See Kumho, 526 U.S. at 141 ("[T]he test of reliability is 'flexible,' and Daubert's list of specific factors neither necessarily nor exclusively applies to all experts or in every case."); Daubert, 509 U.S. at 594 ("The inquiry envisioned by Rule 702 is, we emphasize, a flexible one."). The trial court must use the criteria relevant to a particular kind of expertise in a specific case to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho, 526 U.S. at 152.

In this case, the district court excluded both of plaintiff's proposed experts because it concluded that neither witness 1) qualified as an expert in the design or manufacture of power steering gear boxes; 2) had submitted his work for peer review; or 3) had an opinion as to whether there was a design or manufacturing defect in the steering mechanism. In other words, the district court excluded Muszar and Cassassa because it concluded that they were not qualified

as experts in a relevant field, their conclusions were unreliable, and their opinions would not be helpful to the jury.

We conclude that the district court properly applied the Daubert framework to the proposed expert testimony by considering whether that testimony is reliable and relevant to an issue in the case. We now consider whether the district court abused its discretion in either the conclusion it reached to exclude the proposed testimony or the choice of factors it used to reach that conclusion.

Plaintiff's proposed expert Muszar is a metallurgical engineer with a bachelor's degree and over forty years of practical experience in that field. For seventeen of those years, Muszar worked as an engineer for General Motors. Plaintiff's proposed expert Cassassa has a bachelor's degree in mechanical engineering and over ten years of experience in the field of automobile accident reconstruction and automobile mechanical failure analysis. Two of those years were spent performing accident analysis for General Motors and five were spent performing similar work for a major insurance company. The district court concluded that neither Muszar nor Cassassa is an expert in the field of automotive design or manufacturing. The district court then stated that it believed Muszar is an expert in the field of metallurgical engineering and did not express an opinion on whether Cassassa had expertise in another field./1

We agree with the district court that Muszar and Cassassa are not qualified as automotive engineers. However, we disagree with the district court's subsequent conclusion that because these engineers are not qualified in the field of automotive design or manufacture, their expertise cannot be relevant to the present case. As we discuss below, expert testimony need only be relevant to evaluating a factual matter in the case. That testimony need not relate directly to the ultimate issue that is to be resolved by the trier of fact. See Walker, 208 F.3d at 587. Thus, the district court erred in concluding that Muszar and Cassassa were not qualified as experts in a relevant field solely because their expertise related to an area other than the one concerning the ultimate issue to be decided by the trier of fact.

The district court also concluded that the methodologies employed by Muszar and Cassassa were unreliable because they had not been "peer reviewed." However, as noted above, no single factor among the traditional Daubert list is conclusive in determining whether the methodology

relied on by a proposed expert is reliable. As the Supreme Court stated, "[t]he fact of publication (or lack thereof) in a peer reviewed journal . . . will be a relevant, though not dispositive, consideration." Daubert, 509 U.S. at 594 (emphasis added). In Kumho, the Court made clear that the reliability test under Rule 702 is an individualized test whose relevant factors will depend on the type of expertise at issue in a given case. See Kumho, 526 U.S. at 150 (stating that in some cases "the relevant reliability concerns may focus upon personal knowledge or experience. . . . [T]here are many different kinds of experts, and many different kinds of expertise.") (citations omitted). While the district court noted that neither expert had had his work published in a peer reviewed journal, the district court did not indicate whether publication is typical for the type of methodology these experts purported to employ. The district court merely recited the failure of the experts to publish and concluded that their testimony was unreliable. However, as noted above, lack of peer review will rarely, if ever, be the single dispositive factor that determines the reliability of expert testimony. Without a further explanation of the connection between lack of publication and reliability in this case, we cannot determine the extent to which this factor bears on the reliability of the methodologies used by plaintiff's proposed experts. For example, if Muszar was merely applying well-established engineering techniques to the particular materials at issue in this case, then his failure to submit those techniques to peer review establishes nothing about their reliability. Similarly, if Cassassa's accident reconstruction methodology is based on his extensive practical experience in this area, rather than novel methodology subject to publication, his failure to publish does not cast doubt on the reliability of his analytical technique. However, other factors not considered by the district court, such as the general acceptance of the techniques in the relevant engineering and accident analysis communities or the extent of the experts' practical experience performing those techniques, may bear on the reliability of the proposed evidence. On the record before us, we conclude that the district court erred by relying on a single, potentially irrelevant, criterion to determine that plaintiff's proposed experts based their conclusions on methodologies that are not sufficiently reliable to satisfy the requirements of Rule 702.

Finally, the district court concluded that neither Muszar's nor Cassassa's testimony would be helpful to the jury because neither expert

could conclusively determine whether a design or manufacturing defect caused the failure in the steering gearbox to occur./2 As noted above, in order for an expert's testimony to qualify as "relevant" under Rule 702 it must assist the jury in determining any fact at issue in the case. Although under Rule 704(a) an expert may testify to the ultimate issue in a case, the expert's testimony need not relate to the ultimate issue in order to be relevant under Rule 702. See Walker, 208 F.3d at 587. In this case, Muszar proposed to testify concerning the method by which the parts within the steering gearbox were manufactured and the manner in which those parts failed. Muszar would also have testified that in his opinion there were superior materials Ford could have used in designing some of those parts. Cassassa's proposed testimony related to the manner in which the accident occurred, the cause of the accident, whether the steering had in fact failed, and the timing of the failure in relation to the other events during the accident. Cassassa also proposed to render an opinion as to some possible causes for the steering failure. All of this proposed testimony relates to facts at issue in this case. The district court may have been correct that none of plaintiff's proposed expert testimony bears directly on the ultimate issue of whether a design or manufacturing defect caused plaintiff's accident. However, under Rule 702, expert testimony need only be relevant to an issue in the case; it need not relate directly to the ultimate issue. We conclude that the district court erred when it determined that because plaintiff's proposed expert testimony would not assist the trier of fact with resolving the ultimate issue in the case it failed Rule 702's relevancy requirement./3

Because the district court erroneously determined that neither Muszar nor Cassassa were qualified as experts in a relevant field and that their proposed testimony was not relevant to any fact at issue in this case and because district court failed to consider more than the single factor of peer review in analyzing the reliability of these experts' proposed testimony, we conclude that the district court abused its discretion when it excluded plaintiff's proposed experts./4

B.  Continuance

Plaintiff next argues that the district court erred when it declined his request for a continuance to find new experts after excluding his experts on the day of trial. Because we have concluded that the district court erred in its application of Rule 702 to plaintiff's experts, we need not reach this issue at this time. We

note briefly that a district court has broad discretion in determining when to grant a continuance. See Morris v. Slappy, 461 U.S. 1, 11 (1983); Brooks v. United States, 64 F.3d 251, 256 (7th Cir. 1995). However, where a trial court's own action causes the need for a continuance and that court then denies the continuance, resulting in prejudice to a party, courts have generally found an abuse of discretion. See Fowler v. Jones, 899 F.2d 1088, 1095-96 (11th Cir. 1990); Fenner v. Dependable Trucking Co., Inc., 716 F.2d 598, 602 (9th Cir. 1983).

In this case, the district court did not rule on the admissibility of plaintiff's expert testimony until the day of trial. It is unclear from the record whether plaintiff's late filing of his response to defendant's motion to exclude his experts prompted the court's delay in ruling on that motion. However, we note that in cases such as this one that rely heavily on expert testimony, a district court should set a discovery and trial schedule that realistically provides both sides with an adequate opportunity to introduce necessary evidence. The application of Rule 702 to proposed expert testimony can often be an uncertain process and is best conducted in such a manner that litigants have a reasonable opportunity to locate experts who meet the rule's requirements.

C. Dismissal

Smith finally argues that the district court erred in summarily dismissing his claims with prejudice after excluding his experts. We note that the district court's order dismissing plaintiff's action does not cite any standard or rule under which that dismissal was made. We can only presume, given the stage of the proceedings at which this action was taken, that the district court intended its order to constitute a grant of summary judgment for the defendant. See Fed. R. Civ. P. 12(b) (stating that where a court purports to dismiss a case under 12(b)(6) but considers matters outside of the complaint, the dismissal must be converted to one on summary judgment). However, the instant order contains only the conclusion that the court had struck plaintiff's experts and does not contain any supporting reasoning. In addition, the court did not provide the plaintiff with the opportunity to submit a written response to defendant's motion. See Fed. R. Civ. P. 12(b), 56(c).

We glean from the district court's oral discussion of this issue that it concluded that plaintiff could not establish as a matter of law a claim for relief under Indiana product liability law if he did not have experts to testify on his behalf. Because we have concluded

that the district court abused its discretion in the manner in which it excluded plaintiff's experts, we also conclude that the district court erred in dismissing plaintiff's case on that basis. However, it does not necessarily follow that, even if the proposed expert testimony is admitted, plaintiff has supplied sufficient support for his claim to survive summary judgment. We note that ordinarily dismissals on summary judgment are accompanied by a written analysis of the district court's reasons for dismissing the case. Because this textual exposition of the district court's reasoning is absent here, we cannot determine whether the district court would have been justified in granting summary judgment to the defendant even if plaintiff's expert testimony had not been excluded. We therefore remand this case to the district court for its reconsideration of this issue.

III.   CONCLUSION

     For the reasons stated herein, we Reverse the district court's dismissal of plaintiff's case and Remand this case for further proceedings consistent with this opinion.

/1 The district court stated that it found Cassassa was not an expert in "failure analysis." However, from the context in which this statement was made, we interpret this statement as another means of stating that Cassassa was not qualified as an automotive engineer. The district court did not discuss Cassassa's qualifications in the field of accident reconstruction.

/2 We note that the district court appears to have misconstrued the experts' testimony in this case. Both experts testified that in their opinion the failure in the steering gearbox was caused either by a manufacturing or a design defect. Although neither expert was able to determine which type of defect was the actual cause of the accident, both experts testified that in their opinion some type of defect did exist.

/3 We note that it would be appropriate for a district court to apply Rule 702's requirements to individual pieces of proposed testimony, so that if the district court found a particular part of that testimony irrelevant or unreliable, it could exclude that portion of the testimony without striking the proposed evidence in its entirety.

/4 We wish to emphasize that our ruling is limited to assessing the district court's application of Rule 702 to plaintiff's proposed expert

testimony. We do not express an opinion on whether that testimony should have been admitted. It is possible that after a proper application of the Daubert/Kumho test the district court will still conclude that the proposed testimony, or a portion thereof, is inadmissible under Rule 702. It is also possible that the district court may find that the evidence should be excluded under a different evidentiary rule. Furthermore, the district court may conclude that plaintiff's expert testimony passes all of the evidentiary requirements and is admissible but that, even with that testimony, plaintiff fails to make out a case that survives summary judgment.